# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 17, 2024 Session

## KENNETH DALE CARTER v. JESSICA JONES FAY

**Appeal from the Chancery Court for Greene County**
**No. 2021-CV-177        Douglas T. Jenkins, Chancellor**

_____

**No. E2023-01581-COA-R3-CV**
_____

This appeal stems from a long-standing custody dispute between the mother and father of two minor children. The trial court entered a court-ordered parenting plan in February of 2022, but the parties experienced substantial difficulty co-parenting with one another. Numerous pleadings were filed by both parties, including a petition for modification filed by the mother in May of 2022 and motions for civil and criminal contempt filed by the father against the mother. The trial court held a hearing on all of the parties' pending motions on April 14, 2023, and May 12, 2023. The trial court ultimately determined that no material change in circumstances occurred and left its previously ordered parenting plan and subsequent orders in place. The trial court also found the mother in civil and criminal contempt on eight counts. Further, the trial court declined any further jurisdiction over the case, as the mother and the children had resided in Florida for several years by the time the final order was entered. The father appeals, raising four issues. We affirm the trial court's decision as to custody and contempt. While the father raises evidentiary issues, we conclude that any error by the trial court was harmless. We vacate and remand the trial court's judgment as to continuing jurisdiction over the case.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Vacated in Part; Case Remanded

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Crystal G. Jessee, Greeneville, Tennessee, for the appellant, Kenneth Dale Carter.

Jessica C. McAfee, Greeneville, Tennessee, for the appellee, Jessica Jones Fay.

# OPINION

## BACKGROUND

Unmarried parents Jessica Fay ("Mother") and Kenneth Carter ("Father") share two minor sons, D.C. and B.C. (the "Children").[1] B.C. was born in 2016 and lived with the parents in Tennessee until March of 2021, when Mother left Tennessee and returned to her home state of Florida. Mother left the parties' home after discovering that Father, a truck driver, had been having affairs with men while traveling for work. When she left Tennessee in March of 2021, Mother was pregnant with D.C. who was born in Florida in June of 2021.

Father filed a petition to establish parentage and for parenting time on May 5, 2021, in the Chancery Court for Greene County (the "trial court"). Father also filed a proposed parenting plan making Father the primary residential parent and giving himself 295 days of parenting time. Mother had 70 days of parenting time under this proposed plan, to be exercised every other weekend. In an order entered June 21, 2021, the trial court continued the case and awarded Father temporary parenting time with the older child. Father was to exercise two weeks of parenting time with B.C. in Tennessee and then return him to Mother, who would then exercise two weeks of time. This schedule was to remain in effect until the trial court ordered otherwise.

The parties proceeded to engage in contentious and protracted litigation, with both parties leveling serious allegations against the other. For example, Father accused Mother of abusing drugs while breastfeeding the younger child, D.C., and of failing to follow the trial court's temporary parenting schedule. Based on the foregoing, Father filed a motion for emergency sole custody of the Children on August 17, 2021. Mother responded, claiming that she was unable to follow the temporary parenting schedule because it involved frequent travel to South Carolina from Florida, with a newborn, to drop B.C. off with Father. Mother also argued that Father sent Mother $300 per month as Mother's only source of income, making frequent travel cost prohibitive.

Mother's refusal to transport the Children for their weekend visitation led to Father filing his first motion for contempt on August 25, 2021. Mother did not deny Father's claims, but rather argued that she did not have the funds to make the current arrangement feasible. Mother asked the trial court to order Father to pay more child support and to travel to Florida to exercise his visitation. The trial court held a hearing on September 15, 2021, thereafter finding that the parties' current custody arrangement would stay in place until a final hearing. In an order entered October 6, 2021, the trial court found as follows:

---

[1] This Court has a policy of abbreviating names of children in order to protect their privacy and identities.

As to the Motion for Contempt against [Mother], for her failure to comply with the Court's prior ruling awarding visitation to [Father] with [B.C.] every other weekend, from Friday to Sunday, and the parties shall meet in Walterboro, South Carolina, shall be held in abeyance. The Court is Ordering [Mother] to now bring both children to meet [Father], and allow him to visit with both children from Friday to Sunday, every other weekend, in Walterboro, South Carolina to exchange the [C]hildren for [Father's] visitation.

The trial court also reserved ruling on Father's request for full custody of the Children. In the interim, a Florida judge held a UCCJEA[2] hearing in September of 2021 to determine whether the case should be heard in Florida. The Florida judge determined that Florida would not exercise jurisdiction over the case. The trial court entered an order to this effect.

The parties' difficulties persisted. Between October and December of 2021, Father filed three additional motions for civil and criminal contempt against Mother, the primary allegation being that Mother refused to follow the trial court's orders as to visitation. For example, Father alleged that during one of his weekends in October, Mother told Father she had booked a hotel room in South Carolina and then never showed up. Father alleged that on a different weekend, Mother showed up a day late and interrupted Father's parenting time every three hours to breastfeed D.C. Father alleged that D.C. was already on a formula-based diet and that Mother was intentionally sabotaging Father's parenting time.

The trial court held a contested hearing on December 6, 2021, at which Mother and Father both testified. On February 15, 2022, the trial court entered its own permanent parenting plan designating Mother the primary residential parent and awarding Father 120 days of parenting time. The trial court reasoned that the Children appeared to be doing well in Florida and that Mother performed the majority of the parenting duties. In the attached order, however, the trial court admonished Mother for "sneaking off" to Florida to give birth to D.C., thereby excluding Father.

The trial court ordered that Father would exercise his parenting time the first weekend of every other month in Savannah, Georgia. The plan provided Father with the option to exercise additional weekend visitation with the Children in Florida any weekend he wished to travel to Florida, so long as he provided Mother seven days advance notice. The trial court also ordered Father to pay Mother $414 per month in child support. Additionally, the trial court adjudicated Father's four pending motions for contempt against

---

[2] "UCCJEA" stands for Uniform Child Custody Jurisdiction and Enforcement Act. *See* Tenn. Code Ann. § 36-6-201 *et seq.* The UCCJEA's purpose, among other things, is to "[p]romote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child[.]" Tenn. Code Ann. § 36-6-202(2).

Mother, dismissing the claims for the most part but finding Mother in contempt as to one count and ordering her to pay $500 toward Father's attorney's fees.

Notwithstanding the court-ordered plan, the parties continued to have great difficulty co-parenting. On February 22, 2022, Mother filed a motion asking that Father undergo a psychosexual evaluation and that Father be enjoined from having overnight guests at his weekend visitation with the Children. Mother also alleged that Father was monopolizing weekend time with the Children by traveling to Florida every weekend to see them; as such, Mother requested the trial court limit Father's Florida visitation.

Father then filed his fifth motion for civil and criminal contempt against Mother, alleging that Mother was refusing Father's Florida visitation with the Children and had blocked Father's phone number. In an email from March 1, 2022, Mother indicated to Father that "[v]isitation is halted at this time . . . [e]vidently you've not been served yet." Once again, Mother did not deny blocking Father's parenting time, but instead filed a response detailing the reasons why Father should not have visitation with the Children and again asking the trial court to order Father to undergo a "comprehensive psychological evaluation."

The trial court held a hearing on the parties' pending motions on March 17, 2022, at which both Mother and Father testified. Mother testified that she wanted Father's visitation suspended because of a verbal altercation the parties had on February 6, 2022, in a Denny's parking lot, and because of images Mother had recently discovered on an old cellphone belonging to Father. Over objections by Father's counsel, Mother testified that she found what she considered to be troubling pornographic images on the phone and that she decided to have the phone forensically analyzed. According to Mother, she took the phone to a "data analysis place" that discovered additional images and internet history from the phone. Mother testified that "whatever was recovered from the phone they dumped onto a USB drive and gave both back to me. I put the USB drive in my laptop and went through it." Although Father's counsel objected that Mother could not testify as to what someone else extracted from the old phone, the trial court overruled the objections and allowed Mother to testify as to what she saw. Mother testified that the pornographic images found on the phone involved homosexual activity and minors, among other things. For his part, Father admitted to being bisexual and looking at some of the images on the phone but vehemently denied that any of the pictures involved minors and further denied that he had ever solicited anything from minors online. Father also testified that Mother had been continuing to deny Father visitation time, even when Father traveled to Florida to see the Children.

Following the March 2022 hearing, the trial court entered an order on May 4, 2022, denying Mother's "motion to clarify" the parenting plan, and noting that "the parties shall follow the prior court's Order for the parenting schedule." As relevant, the trial court also ordered:

2. The Court is aware of [Father's] sexual orientation and does not find that that would preclude him enjoying generous visitation, or even custody of the [C]hildren.

3. [Mother] filed a Motion for Injunction Until Father Seeks a Mental Health Evaluation. The court denies the request for Injunction but treats this as a request and therefore, orders that neither party are to have any significant others around the [C]hildren during their parenting time.

4. [Father's] parenting time shall be supervised by either his [m]other or [s]ister.

5. [Father] is ordered to have a psychosexual examination and he shall pay for same. Mother shall be responsible for any other costs associated with providing the psychiatrist with exhibits regarding same.

6. [Mother] is ordered to submit to a parenting/mental evaluation in Florida and she shall pay for same. Father shall be responsible for any other costs associated with providing the professional with exhibits regarding same.

* * *

8. [Father] shall have visitation every First and Third weekend of every month. [Father] shall receive the [C]hildren at 4:00 PM on Fridays and shall return the [C]hildren at 4:00 PM on Sundays. As well as all other previous ordered visitation.

9. The parties shall exchange the [C]hildren at the Seminole County Sheriff[']s Department in Florida, with the exception of every other first weekend of the month, the parties shall meet in Savannah, Georgia to exchange the [C]hildren for pick up and drop off.

The May 4, 2022 order did not address any of Father's pending motions for contempt. Father filed his sixth motion for civil and criminal contempt against Mother on May 2, 2022. Father alleged that he exercised visitation with the Children from March 18, 2022, through March 20, 2022, but that Mother had not allowed Father to visit or speak to the Children since then. Father claimed he had not seen or spoken with the Children in forty-three days. A collective exhibit of the parties' emails contained in the record confirms that Father emailed Mother repeatedly during this period and that she largely did not respond. In an email dated April 14, 2022, Mother told Father that "[a]t this time, it is in the boys' best interest that visitation be halted and only resume pending the results of the investigations and evaluations that will determine the truth."

On May 24, 2022, Mother filed a petition to modify the parties' permanent parenting plan. For the material change in circumstances, Mother again noted the data retrieved from Father's old phone. She also claimed that the results of Father's psychosexual evaluation showed Father has an interest in children. Mother alleged that the parties' older child, B.C., reported odd behavior by Father during his parenting time and that B.C. experienced nightmares upon returning from his visits with Father. Mother did not attach a new proposed parenting plan to her petition. Father responded with a motion to dismiss, arguing that Mother's accusations were already adjudicated at the December 2021 hearing and that Mother was attempting another bite at the apple.

Further, on June 23, 2022, Father filed a response to Mother's petition for modification. Father averred that Mother was alienating the Children from Father and had a habit of keeping the Children from contacting Father. Father alleged that he "is the parent most likely to facilitate a relationship with the other parent, and it is in the [C]hildren's best interest to have little or no contact with [Mother]." Father did not file a proposed parenting plan with this response.

In the time between Mother filing her petition for modification and trial, Father filed three more motions for both civil and criminal contempt against Mother alleging various transgressions. In addition to her normal reticence towards his parenting time, Father claimed that Mother still owed the $500 from the last contempt hearing and that Mother failed to complete her parenting evaluations. Mother also filed two motions for contempt against Father, claiming, *inter alia*, that Father was sharing a bed with B.C. during his parenting time and that Father was behind on child support. On December 21, 2022, Father filed a motion for emergency custody of the Children, claiming "[t]hat the oldest child has been observed several times by Cliff Miller, LCSW, and Mr. Miller has expressed concerns that the Mother is coaching/grooming the child to make false allegations regarding [Father.]" Father averred that the trial court should award him full custody of the Children.

The trial court held a hearing on all the parties' pending motions on April 14, 2023, and May 12, 2023. The trial court heard testimony from both parents, as well as Father's mother, a detective who Mother engaged to investigate Father, and a licensed clinical social worker who evaluated Father. First, the trial court heard testimony on Father's pending motions for civil and criminal contempt against Mother. Much of the proof in this regard centered on Mother's issues with Father's lifestyle and the contents of Father's old cellphone, as these are Mother's primary justifications for keeping the Children from Father and refusing visitation. At the hearing on April 14, 2023, the trial court allowed several images into evidence which were retrieved by the data analysis company and placed on the USB for Mother. Over Father's objection, the trial court allowed Mother to testify as to what she saw in the pictures, as well as where the pictures came from. Mother testified that she did not observe the images on Father's phone itself, but rather she observed the images on the USB drive that the data analysis company mailed to her. Father objected to hearsay and argued that Mother could not properly authenticate the images as having come

- 6 -

from Father's cellphone, insofar as Mother is not the person who forensically extracted the images and placed them on the USB.

It was during the contempt phase that the trial court also heard testimony from Michelle Holt, a detective from the Greene County Sheriff's Department, who reviewed the USB provided by Mother. Detective Holt stated that she did not extract the images on the USB herself but that she reviewed them, and, in her opinion, some of the images contained child sexual abuse material. Detective Holt testified, however, that Father was never charged criminally because she could not link him to the USB and report sent by Mother, as those images were not present on Father's cellphone. Father denied recognizing many of the images.

At the end of the contempt phase, the trial court took the issues under advisement, and the parties moved on to the custody modification portion. Mother testified that she petitioned the trial court for a custody modification because of what she believed was troubling behavior by her oldest son. She claimed that after his visitation with Father, B.C. experiences nightmares, bed-wetting, and other concerning behavior such as compulsive bathing. Mother also testified that she was concerned by the results of Father's psychosexual risk evaluation, which was conducted by Dr. J. Michael Adler,[3] as well as the images that Mother received from the data analysis company that examined Father's old cellphone. Mother also proffered a report by Dr. Andrew J. Pittington, a licensed counselor who Mother hired to evaluate B.C. for ongoing trauma and purported sexual abuse. The report provides that B.C. showed no signs of being sexually abused but that he does suffer from posttraumatic stress disorder and anxiety.

For his part, Father testified about his belief that Mother purposefully alienates the Children from him and refuses to co-parent. Father testified that in the spring of 2022,

---

[3] For clarity, Dr. Adler ultimately concluded that Father was at a low risk of committing sexual acts against children. The report's conclusions are as follows:

1. [Father] presents a low risk to sexually act out. He demonstrated normal sexual interest to adult males and females. He demonstrated no sexual interest to male or female children. There has been no known history of sexual offensive behavior.

2. [Father's] amenability to benefit from treatment is high. [Father] has significant distortions of normal and deviant sexual activity. He demonstrates a lack of emotional intimacy in his relationships with adult males. [Father] is not considered an appropriate candidate for placement in Sexual Offender Treatment.

3. [Father] demonstrates significant distortions and attitudes supportive of healthy and deviant sexual activity. His history suggests sexual interest to male and female adults. He demonstrates normal sexual interest in this age group.

4. There were no risk factors identified that suggested he is a risk to sexually act out against children. [Father's] risk to sexually act out on a child is low.

Father went forty-three days without seeing the Children.  Father also denied seeing the behavior in B.C. that Mother found so concerning and maintained that when Father is with B.C., the child seems normal and happy.  Father called as a witness Mr. Cliff Miller, a licensed clinical social worker, who Father hired to evaluate the "[v]eracity of allegations of child sexual abuse made by [Mother] against [Father]," the "[b]ond between [Father] and his two young sons," and the "[c]oparenting relationship between [Mother] and [Father]."  Per his report, Mr. Miller concluded as follows:

> As stated above, there is no evidence to suggest that [Father] has sexually abused [B.C.], or [D.C.], for that matter. Additionally, there is no evidence to suggest that [Father's] sexual orientation has negatively impacted his ability to parent [the Children]. He is assessed to be not only an appropriate and capable parent, but a loving, nurturing, and effective parent. Clinically, he presents as a fit and proper person to provide for the care, either short-term or long-term, of [B.C.] and [D.C.].

> \*     \*     \*

> The evidence presented to me expresses [Mother's] behaviors to be those of an individual who is emotionally unstable and with a possible mood disorder and possible personality disorder (especially regarding melodramatic, manipulative, and controlling behavior). The evidence also suggests that [Mother] has expressed inappropriate and unhealthy emotional responses to being a parent and has had and may still have trouble coping with being a parent, especially a single parent. It is concerning that clearly [B.C.], and possibly [D.C.], have been exposed to this mother's frantic efforts to prove that [Father] is a pedophile who has sexually abused his own child, though the professional agencies have never substantiated the allegations of abuse or perpetrator, and no evidence presents to corroborate her subjective statements about the allegations. Such behavior is not healthy for a child, often promoting psychological harm, even to the point of psychological abuse.

Mr. Miller reiterated these findings at trial and opined that Mother attempts to alienate the Children from Father.

The trial court entered an order on August 25, 2023, declining to grant Mother's petition for custody modification.  The trial court found that while Father's personal interests might be questionable, they do not amount to a material change in circumstances sufficient to change custody, nor are his sexual preferences a per se bar to visitation with the Children.  The trial court reasoned that supervised parenting time with the paternal grandmother had proven to be a sufficient safeguard and that the parties' current parenting arrangement should stay in place.  The trial court entered another order on August 25, 2023,

stating that it was declining to exercise jurisdiction going forward and that the case should proceed in Florida, per Mother's request. However, the trial court then entered an order on August 31, 2023, ruling on Father's purported request for a modification. Again, the trial court left the parties' current parenting arrangement in place but awarded Father an extra forty days to make up for parenting time that Mother withheld from Father in 2022. The trial court also held Mother in contempt on eight counts and ordered Mother to pay $2,500 toward Father's attorney's fees.

On September 13, 2023, Father filed a "Motion to Reconsider and for Additional Findings." Father alleged that Mother continued to call Father a pedophile in front of the Children and that Father was entitled to an offset in his child support for the forty additional days of parenting time awarded to Father. Father asked the trial court to reconsider its previous order "as it is clear that [Mother] is not mentally stable and capable of caring for the [C]hildren without animosity toward [F]ather."

The trial court entered an order on September 29, 2023, granting in part and denying in part Father's motion for reconsideration. In pertinent part, the order provides:

> 2. That the parties are directed to exchange income information and prepare a new child support worksheet, to determine whether a significant variance exists, which warrant[s] a change to Father's child support obligation.
>
> 3. That Child Support Enforcement is authorized to calculate the amount of child support arrearages during the Summer months of 2022, and Summer months of 2023, with exception to a period of 40 days where Father was awarded make-up time with the [C]hildren, and [Father] shall receive a credit of 1.33 months support, against any arrearages that may be due.
>
> 4. That all motions for contempt have been fully adjudicated and the Court declines to find anyone in contempt or make any additional findings which were not included in the court's prior orders.
>
> 5. To the extent there are any other motions which have not previously been ruled on, the Court denies all the requested relief in the motions and these matters are hereby concluded.
>
> 6. This order is considered final for purposes of appeal once the child support enforcement office enters an order on the arrearages.

An order regarding child support was entered on November 7, 2023, and Father then filed a timely appeal to this Court.

ISSUES

Father raises four issues on appeal, which we restate slightly:

I.    Whether the trial court erred as a matter of law by not awarding Father the majority of the parenting time and not lifting the supervision of Father's parenting time.

II.    Whether the trial court erred as a matter of law by not assessing jail time to Mother for being found in criminal contempt.

III.    Whether the trial court erred by allowing exhibits to be admitted at trial which were not properly authenticated and/or were hearsay.

IV.    Whether the trial court erred in declining further jurisdiction over this case.

In her posture as appellee, Mother raises the following issues:

V.    Whether the trial court erred in ordering that the parties' younger child's last name should be changed to Carter.

VI.    Whether Mother is entitled to attorney's fees on appeal.

**DISCUSSION**

*I.    Custody*

On appeal, Father first argues that the trial court erred in resolving the custody modification. The trial court ultimately found that the parties' custody arrangement would remain the same and that no material change in circumstances occurred. Our Supreme Court has reiterated "the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 692–93 (Tenn. 2013)). The trial court's factual findings are reviewed "de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Id.* Whether a material change in circumstances has occurred is a question of fact, as is whether a parenting plan modification is in the best interest of a child. *Id.* Accordingly, we "presume that a trial court's factual findings on these matters are correct and [will] not overturn them, unless the evidence preponderates against the trial court's findings." *Id.*

The entirety of Father's briefing on this issue turns on his argument that "[n]either the facts nor the trial court's analysis of the best interest factors support continued

limitation of Father's parenting time and [Mother] being designated the primary residential parent." The problem with this argument, however, is that the trial court found no material change in circumstances and, thus, did not do a best interest analysis. Modification of a permanent parenting plan involves two steps:

> After a permanent parenting plan has been incorporated into a final order or decree, the parties are required to comply with it unless and until it is modified as permitted by law. *Armbrister*, 414 S.W.3d at 697; *see* Tenn. Code Ann. § 36-6-405. "In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the 'best interest' factors of section 36-6-106(a)." *Id.*; *see* Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C).

*C.W.H.*, 538 S.W.3d at 496. In this case, the trial court entered an order on August 25, 2023, noting "that there has not been a substantial and material change in circumstances since the entry of the [permanent parenting plan], which justifies a modification to the court ordered parenting plan." In a different order entered August 31, 2023, the trial court again reiterated that it was "leav[ing] everything like it currently is, in the prior parenting plan, and subsequent orders[.]" Clearly, the trial court did not find a material change in circumstances sufficient to modify the parties' custody arrangement, which is the first step in a modification action. *See id.* Accordingly, nowhere in the trial court's 2023 orders did it analyze the best interest factors found at Tennessee Code Annotated section 36-6-106. While Father painstakingly addresses the factors in his brief, application of the factors is simply not an issue that the trial court reached or rendered a decision on.[4] Father does not argue in his brief that the trial court erred in finding no material change in circumstances after the modification hearing. Accordingly, there is nothing for this Court to review; indeed, we do not address issues for the first time on appeal.[5] *Heatherly v. Merrimack Mut.*

---

[4] In his brief, Father cites to the trial court's best interest analysis from the December 6, 2021 hearing transcript, which is from the parties' initial custody hearing. The orders appealed from, however, are the orders entered in the fall of 2023 following the trial on Mother's petition for *modification* of custody. While Father appears to conflate these two separate proceedings, the initial, court-ordered permanent parenting plan was never appealed from and is not at issue.

[5] Father's argument is also problematic in that it assumes Father filed his own petition for modification of the parties' parenting plan, which he did not. Rather, when Mother filed her petition for modification of the plan on May 24, 2022, Father filed a response to Mother's petition on June 23, 2022. Therein, Father averred that Mother was alienating the Children from Father and kept the Children from contacting Father. Father further alleged that he "is the parent most likely to facilitate a relationship with the other parent, and it is in the [C]hildren's best interest to have little or no contact with [Mother]." Father did not mention a modification of the permanent parenting plan, did not cite to Tennessee Code Annotated section 36-6-101, and did not plead a material change in circumstances. Then, on December 21, 2022, Father filed a motion for emergency custody of the Children, claiming "[t]hat the oldest child has been observed several times by Cliff Miller, LCSW, and Mr. Miller has expressed concerns that [Mother] is coaching/grooming the child to make false allegations regarding [Father.]" Again, Father averred that the trial court should award him full custody of the Children but did not plead a modification under section

- 11 -

*Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000). And, in any event, there is no error in the trial court's finding that there has been no material change in circumstances, as these parties have never been able to successfully co-parent and Mother has always taken issue with Father's lifestyle.

## II.    Contempt

Father next contends that the trial court erred in failing to sentence Mother to jail time after finding Mother in criminal contempt of the trial court's orders on eight counts. "[C]riminal contempt is used to 'preserve the power and vindicate the dignity and authority of the law' as well as to preserve the court 'as an organ of society.'" *Baker v. Baker*, No. M2010-01806-COA-R3-CV, 2012 WL 764918, at *11 (Tenn. Ct. App. Mar. 9, 2012) (quoting *Black v. Blount*, 938 S.W.2d 394, 398 (Tenn. 1996); citing *Thigpen v. Thigpen*, 874 S.W.2d 51, 53 (Tenn. Ct. App. 1993)); *see also Ahern v. Ahern*, 15 S.W.3d 73, 78 (Tenn. 2000) ("An act of contempt is a wilful or intentional act that offends the court and its administration of justice." (citing Tenn. Code Ann. § 29-9-102)).

With regard to criminal contempt,

Tennessee Code Annotated section 29-9-102 authorizes courts to "inflict punishments for contempts of court" for, inter alia, "[t]he willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts[.]" Tenn. Code Ann. § 29-9-102(3). In this situation, "[t]here are three essential elements to criminal contempt: '(1) a court order, (2) the defendant's violation of that order, and (3) proof that the defendant willfully violated that order.'" *Pruitt v. Pruitt*, 293 S.W.3d 537, 545 (Tenn. Ct. App. 2008) (citing *Foster v. Foster*, No. M2006-01277-COA-R3-CV, 2007 WL 4530813, at *5 (Tenn. Ct. App. Dec. 20, 2007)). In addition, the plaintiff must show the following four elements: (1) the order allegedly violated was lawful; (2) the order was clear and unambiguous; (3) the individual charged did in fact violate the order; and (4) the individual acted willfully in so violating the order. *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354-55 (Tenn. 2008); *Furlong v. Furlong*, 370 S.W.3d 329, 336 (Tenn. Ct. App. 2011) (stating that the four-element analysis outlined in *Konvalinka* applies to criminal and civil contempt actions).

36-6-101 and did not plead a material change in circumstances. Neither a response to a modification petition nor a motion for emergency custody is the same as a petition for modification under section 36-6-101. Consequently, Father's argument that the trial court erred in its analysis of the best interest factors under section 36-6-106 also lacks merit, inasmuch as Father never properly requested a modification of custody and the trial court never reached this issue with regard to Mother's request.

*Hill v. Hill*, 682 S.W.3d 184, 210 (Tenn. Ct. App. 2023) (quoting *Mawn v. Tarquinio*, No. M2019-00933-COA-R3-CV, 2020 WL 1491368, at *3 (Tenn. Ct. App. Mar. 27, 2020)). Section 29-9-103(b) provides that a contemnor may be sentenced for up to ten days for each act of contempt. *In re Sneed*, 302 S.W.3d 825, 828 (Tenn. 2010). "When the defendant is found guilty of criminal contempt, the trial court has the discretion to impose a sentence and to require that the defendant serve the sentence imposed or, alternatively, to place the contemnor on probation subject to reasonable terms and conditions." *Baker*, 2012 WL 764918, at *11.

The trial court heard extensive proof on April 14, 2023, and May 12, 2023, as to the contempt allegations. In an order entered August 31, 2023, the trial court found Mother in civil and criminal contempt for eight occasions on which Mother refused to follow the trial court's various orders:

> The Court finds, that at all times, and material to those Motions for Contempt, there was a valid order in place. Mother's defense for the contempt[]s is that she disagreed with [Father's] lifestyle. The Court heard about [Mother's] concerns early o[n], and took precautions to safeguard the [C]hildren, those of which [Father] agreed with pending a final hearing. Additionally, the Court ordered both [Mother] and Father to submit to psychological examination, that of which [Father] completed and submitted. The Court believes the safety measures that it took, was sufficient, to safeguard the [C]hildren and [Mother] never, at any time, had legitimate veto power over the Court. The Court had previously found [Mother] in Contempt, for failing to abide by the initial custody Orders.

> Based upon this, and the findings as shown in the trial transcript, the Court finds [Mother] guilty of the eight (8) counts of contempt filed against her. The Court thinks it is a continuing crime, or scheme, and will sentence her to one, ten (10) day offense for that, and suspend that jail time. The last time the Court held her in contempt, she was ordered to pay attorney fees. This time, the Court will Order her to pay $2500 in attorney fees, in addition to those she was previously Ordered to pay. The Court is suspending jail time, this time, to hopefully convince her to follow a court order.

For her part, Mother does not argue on appeal that the trial court erred in finding her in contempt. Father maintains that the trial court was too lenient with Mother and should have sentenced her to additional jail time given the circumstances. Father opines that "Mother continuously blatantly refuses to abide by the [trial] [c]ourt's Orders[,]" and that "[w]hen all else fails, there needs to be punishment."

Mother has engaged in a continuing pattern of disregard for the trial court's orders. On multiple occasions, Mother blatantly refused to produce the Children for Father's court-ordered visitation. On other occasions, Mother made visitation overly onerous for Father, for example by showing up twenty-four hours late to the agreed-upon visitation location or refusing to communicate travel details to Father. Mother's communications with Father establish contempt not only for Father but also blatant disobedience of the trial court's orders. At one point, Mother told Father that she was not obligated to follow the parties' court-ordered permanent parenting plan because she did "not view, approve or sign the permanent parenting plan." When counseled directly by the trial court that the parenting plan was a court order, Mother's behavior persisted. Mother unilaterally halted visitation and withheld the Children from Father many times in this fashion, and she did not deny this at trial. Instead, she maintained that her actions were in the Children's best interest. Again, Mother does not bother denying her many acts of contempt on appeal.[6]

Accordingly, we agree with Father that Mother's suspended sentence is overly lenient, and, in our view, the trial court has exhausted all other options aside from jail. Nonetheless, "the trial court has the discretion to impose a sentence and to require that the defendant serve the sentence imposed or, alternatively, to place the contemnor on probation subject to reasonable terms and conditions." *Baker*, 2012 WL 764918, at *11. Further, the decision to make Mother actually serve the sentence imposed based on future violations "embodies a separate exercise of discretion." *Id.* at *12 (citing *State v. McCoy*, No. M2011-00006-CCA-R3-CD, 2011 WL 6916227 (Tenn. Crim. App. Dec. 28, 2011)). While this Court may have reached a different outcome as to this issue, nothing suggests that the trial court abused its discretion here. And absent an abuse of discretion, we will not disturb the trial court's ruling or substitute our judgment for that of the trial court.

## III.    *Evidentiary issues*

Next, Father challenges the admission of various exhibits at the April and May 2023 hearings. We review evidentiary decisions based on the abuse of discretion standard. *Caldwell v. Ruby Falls, LLC*, 674 S.W.3d 899, 908 (Tenn. Ct. App. 2023). The trial courts are afforded "wide latitude" on such decisions. *Id.* (quoting *McGarity v. Jerrolds*, 429 S.W.3d 562, 566 (Tenn. Ct. App. 2013)).

> "The abuse of discretion standard requires us to consider: (1) whether the decision has a sufficient evidentiary foundation; (2) whether the trial court correctly identified and properly applied the appropriate legal principles; and (3) whether the decision is within the range of acceptable alternatives." *Id.* (citing *Crowe v. First Am. Nat'l Bank*, No. W2001-00800-COA-R3-CV, 2001 WL 1683710, at *9 (Tenn. Ct. App. Dec. 10, 2001)).

---

[6] In fairness, Father has also exhibited bad behavior and poor judgment at times. Mother's disregard for the trial court's orders, however, is egregious and unmatched by Father's behavior.

*Id.* When "reasonable judicial minds can differ concerning [an evidentiary ruling's] soundness[,]" this Court "permit[s] a discretionary decision to stand . . ." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Further, even if the trial court erred in an evidentiary ruling, the ruling may still stand if the error was harmless and did not affect the outcome of the trial. *See McAdams v. McAdams*, No. E2019-02150-COA-R3-CV, 2020 WL 4723762, at *8 (Tenn. Ct. App. Aug. 13, 2020).

Here, we affirm the trial court's ruling for multiple reasons. First, Father's briefing on the evidentiary issues is skeletal and unsupported by legal authority. Almost the entirety of his argument regarding what happened at trial[7] provides as follows:

> Dr. Pittington's report was entered into the record for identification purposes and later as an exhibit, over the objection of counsel, as the report was hearsay, and Dr. Pittington's deposition was never completed to authenticate the same. (Transcript Vol. 14, p. 145-146) Further, Father's counsel objected to a cell phone extraction, as it is a business report, and no one from the company came forward to identify the report and [Mother] refused to produce the phone for inspection by [Father's] counsel. (Transcript Vol. 15, p. 228) The Court's response was "Well, can we unsee something that we've seen?" (Transcript Vol. 15, p. 230) Father also pointed out that this is an additional issue with the chain of custody. (Transcript Vol. 15, p. 232)

> Therefore, the contents of the USB and the report are hearsay, as no party can identify them, and there is not an exception available to allow introduction. Accordingly, the evidence was not properly authenticated and should not have been entered or considered.

Per Tennessee Rule of Appellate Procedure 27(a), an appellant's brief *shall* contain an argument setting forth, *inter alia*, "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities. . ." Where a party makes no argument or cites no authority in support of his issues, or "where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). While it is somewhat clear from Father's briefing that he takes issue with the Pittington report and pictures admitted at trial, he cites no legal authority explaining how the trial court abused its discretion, and he conflates the issues of hearsay and authentication without explaining which objection goes with which piece of evidence and why. *See id.* ("It is not

---

[7] Father also briefly addresses evidentiary rulings from proceedings from March of 2022 in his brief; those proceedings are not at issue on appeal, however.

the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her . . .").  As such, his argument is skeletal.

Placing aside the problems with his briefing, however, we nonetheless conclude that the trial court should be affirmed.  First, Father did not properly preserve an objection to Dr. Pittington's report.  Dr. Pittington, who did not testify at trial, is a licensed counselor who Mother hired to evaluate B.C. for ongoing trauma and purported sexual abuse.  Father argues that "Dr. Pittington's report was entered into the record for identification purposes and later as an exhibit, over the objection of counsel, as the report was hearsay, and Dr. Pittington's deposition was never completed to authenticate the same."  While Father's counsel initially raised issues regarding the report at trial, counsel eventually agreed that the report should come in.  Father's counsel conceded that the report was helpful to Father, seeing as Dr. Pittington ultimately determined that B.C. did not exhibit signs of being abused by Father.  Specifically, at the April 14, 2023 hearing, Father's counsel stated: "**I will not object to the report coming in because it helps us. It absolutely helps us. But I don't think the deposition should come in**." (Emphasis added).  Accordingly, while in his appellate brief Father maintains that Dr. Pittington's report was unauthenticated and/or inadmissible hearsay, what Father took issue with at the final hearing was Dr. Pittington's *deposition*, which was not admitted.  Because Father conceded at trial that the report was helpful to him and did not object to making the report an exhibit, any issue Father now raises regarding Dr. Pittington's report is waived.  *See State v. Reynolds*, 635 S.W.3d 893, 930 (Tenn. 2021) ("Tennessee law requires a timely and specific objection in the trial court to preserve an evidentiary issue for appellate review.").

The second item Father takes issue with is several pictures that were admitted under seal, which were allegedly extracted from Father's phone and placed on the USB drive given to Mother by the data analysis company.  Father timely objected to these pictures at trial, arguing that Mother did not extract the pictures from Father's old phone, and that no one from the data analysis company was present to testify about where the pictures came from or how they ended up on the USB drive.  The trial court overruled those objections and allowed Mother to testify about what she observed in the various pictures and where the pictures came from.  In his appellate brief, Father claims that the pictures are unauthenticated and that the testimony regarding where the pictures came from is hearsay.

Pursuant to our rules of evidence, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).  "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802; *see also* Tenn. R. Evid. 803 (addressing exceptions to the general hearsay rule).  We bear in mind "that the purpose of the rule is to ensure the reliability and trustworthiness of the statements sought to be admitted." *State v. Henry*, 33 S.W.3d 797, 803 (Tenn. 2000).

In contrast, authentication of evidence is a separate issue. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a); *see also* Tenn. R. Evid. 901(b) (providing non-exclusive examples of authentication "conforming with the requirements of" Rule 901). Photographs "must be verified and authenticated by a witness with knowledge of the facts" prior to being admitted into evidence. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). "Generally, 'a photograph can be authenticated by proof that it depicts what it is claimed to depict, Rule 901(a).'" *State v. Spivey*, No. M2018-00263-CCA-R3-CD, 2020 WL 598347, at *10 (Tenn. Crim. App. Feb. 7, 2020) (quoting Neil P. Cohen et al., *Tennessee Law of Evidence*, § 9.01(3)(c) (6th ed. 2011) (bracketing omitted)). Moreover,

> it is not necessary . . . that the witness through whom a photo is being introduced was also the photographer who took the photo in question. Any person, whether or not the photographer, familiar with the place or item that was photographed can authenticate the picture by testifying that it is a true and accurate depiction of the location or item at issue in the case.

*Id.*

Again, notwithstanding the deficiencies in his briefing, we agree with Father that the trial court erred in admitting the photographs, specifically sealed exhibits twenty-three and twenty-five which were admitted at the April 14, 2023 proceedings. The photographs were not properly authenticated, and the testimony regarding where the pictures came from was inadmissible hearsay. As to authentication, no witnesses at trial could confirm, with first-hand knowledge, where the pictures came from. Mother testified that she got the pictures from a data analysis company that placed the pictures on a USB drive for her. No one from this company testified at trial, and neither Mother nor Detective Holt could confirm that the pictures were taken from Father's old phone. In fact, both Mother and Detective Holt testified that when they examined Father's phone, the relevant pictures were not on it. Detective Holt also testified that Father was not charged criminally because she could not link him definitively to anything found on the USB. Accordingly, no one familiar with the places and things depicted could confirm the pictures' authenticity at trial, nor could anyone testify as to their origin. Moreover, while it is undisputed that Father used the phone at one point in time, it is also undisputed that phone has not been in Father's possession for several years, as Mother took the phone with her when she left Tennessee for Florida in 2021.

In that vein, Mother testified that she learned from the data analysis company that the pictures on the USB were extracted from Father's phone through forensic analysis. This testimony, however, is hearsay because it is an out-of-court statement offered for the truth of the matter asserted, specifically, it is a statement by the data analysis company that

the pictures were found on Father's phone. Although Mother's counsel asserted some hearsay exceptions in response to Father's objections at trial, this statement from the data analysis company was clearly offered for its truth, as the cornerstone of Mother's request for a modification was Father's alleged proclivities.

Consequently, the trial court erred in admitting sealed exhibits twenty-three and twenty-five which were admitted at the April 14, 2023 proceedings. The photographs were not properly authenticated, and the testimony regarding where the pictures came from was inadmissible hearsay. Thus, the trial court reached its conclusions about the pictures based on a clearly erroneous assessment of the proof, thereby abusing its discretion.

Nonetheless, we ultimately conclude that the error was harmless and did not affect the outcome of the trial. Father's sexual orientation has been an undisputed fact since the parties went before the trial court in December of 2021 to determine their initial custody arrangement. From the very beginning of this case, Mother has lodged accusations against Father and has accused him of letting his sexual orientation affect his parenting, none of which has been borne out by the evidence.[8] On the record before us, the trial court has never treated Father's orientation as a bar to custody, even stating in written orders that Father's orientation is not a bar to custody. While the previous proceedings are not at issue in this appeal, the trial court had already seen highly sexual images purportedly from Father's phone at previous hearings, such as the hearing on December 6, 2021, and the hearing on March 17, 2022. The images introduced at the April and May 2023 hearings did not sway the trial court's opinion of Father, given that the trial court determined there was no material change in circumstances warranting a change in custody, and that Father should still enjoy robust parenting time with the Children.

Based on the foregoing, and because Father's briefing on this issue is skeletal, we are unable to determine how the outcome of this case would have been different but for the photos at issue. Accordingly, any error by the trial court was harmless.

*IV.     Jurisdiction*

For his last issue, Father argues that the trial court erred in declining any further jurisdiction over the present case. The trial court found in an order entered August 25, 2023, that it no longer makes sense for this litigation to proceed in Greene County, Tennessee, explaining that several witnesses are in Florida and that Florida is now the Children's home state.

---

[8] Mother admitted at trial that multiple agencies, including law enforcement in Tennessee and children's services in Florida, have investigated Father for alleged sexual abuse. None of the investigations have revealed any wrongdoing by Father against the Children or any other minor child.

Per the UCCJEA,

A court of this state which has jurisdiction under this part to make a child-custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court.

Tenn. Code Ann. § 36-6-222(a). However,

(b) Before determining whether it is an inconvenient forum, a court of this state shall consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court shall allow the parties to submit information and shall consider all relevant factors, including:

(1) The length of time the child has resided outside this state;

(2) The distance between the court in this state and the court in the state that would assume jurisdiction;

(3) The relative financial circumstances of the parties;

(4) Any agreement of the parties as to which state should assume jurisdiction;

(5) The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;

(6) The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence;

(7) Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child; and

(8) The familiarity of the court of each state with the facts and issues in the pending litigation.

(c) If a court of this state determines that it is an inconvenient forum and that a court of another state is a more appropriate forum, it shall stay the proceedings upon condition that a child-custody proceeding be promptly commenced in another designated state and may impose any other condition the court considers just and proper.

Tenn. Code Ann. § 36-6-222(b) & (c). "We review a court's decision to decline jurisdiction based on inconvenient forum under the abuse of discretion standard." *In re Arabella L.*, No. M2017-01069-COA-R3-JV, 2017 WL 5713939, at *2 (Tenn. Ct. App. Nov. 28, 2017) (citing *Busler v. Lee*, No. M2011-01893-COA-R3-CV, 2012 WL 1799027, at *2 (Tenn. Ct. App. May 17, 2012); Tenn. Code Ann. § 36-6-222(a)). In *Arabella L.*, this Court considered the proper procedure for a trial court to decline jurisdiction pursuant to section 36-6-222. *Id.* at *1. In that case, the child at issue was born in Tennessee but moved with her mother to Alabama shortly thereafter. *Id.* The father remained in Tennessee, and the Juvenile Court for Montgomery County, Tennessee entered the initial agreed parenting plan regarding the child. *Id.* A few years later, however, the mother filed a petition for modification in Alabama. *Id.* The father then filed a competing modification action in the Montgomery County Juvenile Court, and the mother responded with "a motion requesting that the Tennessee court conduct a telephone conference with the Alabama court to determine appropriate jurisdiction under the UCCJEA." *Id.* Ultimately, the Montgomery County Juvenile Court declined jurisdiction over the case and dismissed the father's petition. *Id.*

This Court reversed the juvenile court on appeal, explaining that

> [t]he UCCJEA [] strongly encourages the court to communicate with the alternative forum before making a decision. *Id.* § 36-6-213 cmt. And the court must ensure that a record of the communication is made and provided to the parties. *Id.* § 36-6-213(d). The record should detail the substance of the communication and inform the parties of the content of the conversation. *See Bishop v. Milner*, No. E2002-01357-COA-R3-CV, 2003 WL 21458588, at *2 (Tenn. Ct. App. June 19, 2003).

*Id.* at *2 (footnote omitted). We further opined that

> [w]here, as in this case, the court does not permit the parties to participate in its communication with the court of the other state, the parties "must be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made." Tenn. Code Ann. § 36-6-213(b). Although [the m]other and [the f]ather were given the opportunity to submit legal arguments, neither party was allowed to present facts before the Tennessee court announced its decision. This Court has opined that the UCCJEA does not "require a full evidentiary hearing prior to the trial court rendering a decision," but the parties must be given an opportunity to submit affidavits or other evidence to the court on the jurisdictional issue. *See Kapustka v. Kapustka*, No. M2015-01984-COA-R3-CV, 2016 WL 3250120, at *4–5 (Tenn. Ct. App. June 3, 2016) (noting that both parties submitted evidence through affidavits); *In re Lazaria C.R.H.*, No. W2012-02308-COA-R3-JV, 2014 WL 72276, at *3–4 (Tenn. Ct. App. Jan. 9, 2014) (vacating decision to decline

- 20 -

jurisdiction when the parties were not given the opportunity to submit evidence on the relevant factors); *Busler*, 2012 WL 1799027, at *3–4 (affirming decision to transfer after concluding that court's decision was supported by affidavit evidence in the record).

* * *

Here, the Tennessee court apparently based its decision solely on the conversation with the Alabama court. And, from this record, we cannot determine whether the Tennessee court considered the statutory factors found in Tennessee Code Annotated § 36-6-222(b).

*Id.* at *3. We remanded the case back to the juvenile court with instructions for it to "consider the statutory factors in light of the evidence presented to determine whether Tennessee or Alabama is a more convenient forum for this modification proceeding." *Id.* at *4. We instructed that "[t]he court's order must 'set forth the basis for its jurisdictional decision, including any court-to-court communication which may have been a factor in the decision.'" *Id.* (citing Tenn. Code Ann. § 36-6-213 cmt.).

The same result is warranted here. While the trial court entered an order explaining that Florida is now the Children's home state and the litigation is now more appropriate in that forum, the trial court did not follow the procedure outlined above. Although the trial court was acting on a motion to transfer jurisdiction filed by Mother, there is nothing in the record suggesting that the trial court communicated with the relevant Florida court prior to making this decision. This omission in the record is significant given that Florida has already declined jurisdiction over this case once before. Moreover, the trial court's order on this issue does not reflect that it considered the factors mentioned in section 36-6-222(b); indeed, the order does not mention the relevant statutes at all. And finally, although the trial court declined jurisdiction over this case in the order entered August 31, 2023, it did not thereafter "stay the proceedings upon condition that a child-custody proceeding be promptly commenced in another designated state . . ." Tenn. Code Ann. § 36-6-222(c). Instead, the parties continued to litigate this case in the trial court until Father filed his notice of appeal on November 9, 2023.

Based on the foregoing, we deem it prudent to vacate the trial court's order declining further jurisdiction, and we remand the case for further proceedings. On remand, the trial court is instructed to consider all the relevant statutory factors when determining whether to decline further jurisdiction and is "strongly encourage[d] to communicate with the alternative forum before making a decision." *In re Arabella L.*, 2017 WL 5713939, at *2 (citing Tenn. Code Ann. § 36-6-213 cmt.).

## V.     Name change

Having resolved Father's issues on appeal, we turn to the issues Mother raises in her posture as appellee.  Mother first argues that the trial court erred in ordering that the parties' younger child's last name be changed to Father's last name.  Mother claims that "Father [did not meet] his burden of proof to change the minor child's last name, as it was his burden to prove the necessity of a name change and the court erred in changing it."  Mother also asserts that the trial court did not consider the appropriate statutory factors when making this decision.

We conclude, however, that this issue is waived.  The trial court first ordered that D.C.'s last name should be changed at the parties' contested hearing on December 6, 2021, after which the trial court entered the court-ordered parenting plan on February 15, 2022.  In the attached order, the trial court found that the "surname of [D.C.] [] shall be changed to Carter, and that a birth certificate application shall be prepared and submitted to reflect that [Father] is the legal and biological father of the minor child[.]"  The permanent parenting plan went into effect, and Mother filed a motion for clarification of the plan on February 22, 2022; nowhere in this motion did Mother raise the issue of D.C.'s name.  After a hearing in March of 2022, the trial court entered an order on May 4, 2022, denying Mother's request for a "clarification."  Mother then filed her petition for a custody modification on May 24, 2022.  Accordingly, Mother did not appeal from the order memorializing the trial court's rulings announced at the December 6, 2021 hearing or its later order declining to modify those findings; rather, Mother opted to file a petition for modification of the parenting plan on May 24, 2022.  Again, Mother did not mention or make any requests regarding D.C.'s name change in the modification petition.

An order legitimating D.C. was entered on May 12, 2023, the second day of trial.  This order provides that "[D.C.'s] last name shall reflect [Father's] name and be changed to Carter."  Accordingly, Mother asserts that because this order was entered so late, the issue of D.C.'s last name is now ripe for appeal.  Nonetheless, nothing in the record suggests that Mother contested D.C.'s name change after the trial court originally ordered it on February 15, 2022.  D.C.'s name was not a contested issue at trial, and the order legitimating D.C. entered on May 12, 2023, is an agreed order signed by Mother's counsel.  The transcript from April 14, 2023, reflects that when the trial court asked the parties if they had preliminary matters to take up, Father's counsel noted that an order of legitimation had not been entered and that she had a copy of the agreed order for the court.  Father's counsel stated: "[Mother's counsel] has just given me -- she has signed it, I have signed -- well, this is my copy I previously signed. The only other thing is I need the Judge's signature of the copy."  At no point did Mother's counsel object, indicate she had an issue with the name change, or voice that she wanted to re-address the issue of D.C.'s last name.  The name change has been ordered by the trial court since February of 2022 without objection, and Mother raises this issue at the latest possible hour.  Consequently, this issue is waived.

*VI.    Appellate attorney's fees*

Finally, Mother asserts that she is entitled to an award of attorney's fees on appeal, arguing that Father's appeal is frivolous pursuant to Tennessee Code Annotated section 27-1-122.  "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that [an appeal] can ever succeed."  *Morton v. Morton*, 182 S.W.3d 821, 838 (Tenn. Ct. App. 2005) (quoting *Indus. Dev. Bd. of the City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995)).  Tennessee Code Annotated section 27-1-122 provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Whether to award attorney's fees under section 27-1-122 is within this Court's discretion. *See McDonough v. McDonough*, 499 S.W.3d 401, 406 (Tenn. Ct. App. 2016).

Under all the circumstances, we cannot conclude that Father's appeal is altogether devoid of merit or taken solely for delay.  It is also worth noting that many of the difficulties in this case stem from Mother's inability and/or refusal to follow court orders.  Consequently, we exercise our discretion to decline Mother's request for her appellate attorney's fees.

### CONCLUSION

The ruling of the Chancery Court for Greene County is affirmed in part and vacated in part, and we remand the case for further proceedings consistent with this opinion.  Costs on appeal are assessed one-half to the appellant, Kenneth Carter, and one-half to the appellee, Jessica Fay, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE